The appeal to the Court of Civil Appeals was from an order terminating the parental rights of Gail Ogle as to her seven-year-old daughter, Krystal. The Court of Civil Appeals affirmed, 516 So.2d 242. We granted certiorari.
The Court of Civil Appeals, in Hickman v. Alabama Departmentof Pensions Security, 489 So.2d 601, 602 (Ala.Civ.App. 1986), summarized the applicable rules and guidelines for courts in parental-rights-termination cases as follows:
 "Natural parents have a fundamental and prima facie right to the custody of their child. Glover v. Alabama Department of Pensions and Security, 401 So.2d 786 (Ala.Civ.App. 1981). There is a presumption that the child's best interest will be served by placing it in the custody of the natural parents. Vinson v. AGAPE of Central Alabama, Inc., 416 So.2d 1075
(Ala.Civ.App. 1982). This presumption may be overcome only where there is clear and convincing evidence that it would not be in the child's best interest to be in the natural parents' custody. Matter of Moore, 470 So.2d 1269 (Ala.Civ.App. 1985). The court must make several findings in order to terminate parental rights. The court must first find that the child is dependent based on clear and convincing evidence. § 12-15-65(e), Code of Alabama 1975. If the court finds that the child is dependent, it must then find that there exists no viable alternative to termination of the parents' custodial rights. Matter of Burnett, 469 So.2d 627
(Ala.Civ.App. 1985)."
The only issue is whether there was clear and convincing evidence before the trial court to support its order terminating Ms. Ogle's parental rights.
Section 12-15-1(10), Code of Alabama (1975), defines "dependent child," in pertinent part, as follows:
 "a. [A child] [w]ho, for any reason, is destitute, homeless, or dependent on the public for support; or
 "b. [A child] [w]ho is without a parent or guardian able to provide for his support, training or education; or *Page 244 
 "f. [A child] [w]ho is in such condition or surroundings or is under such improper or insufficient guardianship or control as to endanger his morals, health or general welfare; or
 "g. [A child] [w]ho has no proper parental care or guardianship; or
 "k. [A child] [w]hose parents, guardian or other custodian are unable to discharge their responsibilities to and for the child. . . ."
No serious dispute exists over the classification of Krystal as a dependent child. Krystal was in foster care from January 7, 1980, to June 12, 1981, upon Ms. Ogle's request. From June 1981 until April 1984, Krystal lived with her mother. However, on April 18, 1984, Krystal was returned to foster care pursuant to a pick-up authorization from a juvenile judge. Krystal has been living with a foster family since that time.
Gail Ogle is a diagnosed chronic schizophrenic. She has voluntarily been receiving treatment since June 1985 and is presently residing at the Cahaba Regional Transitional Home, a halfway house in Selma, Alabama, providing its tenants with access to social workers and assistance in job placement. A counselor at the home stated that Ms. Ogle is progressing "fairly well"; however, it is clear from the other evidence presented that Ms. Ogle has not yet reached the stage where she can care for her seven-year-old child. Accordingly, we are in complete agreement with the trial court's determination of the dependency of Krystal Ogle.
Before parental rights may be terminated, all viable alternatives to termination of those rights must be examined to ensure that there is no less drastic measure available.Brand v. Alabama Department of Pensions Security,479 So.2d 66 (Ala.Civ.App. 1985); Matter of Colbert, 474 So.2d 1143
(Ala.Civ.App. 1985). Ms. Ogle asked the court to consider placing the child with her sister and brother-in-law, Uveda and Ed Grant. The Montgomery County Department of Pensions and Security investigated the Grants' home; however, it would not recommend placement there. The home evaluation report provided as follows:
"HOUSEHOLD COMPOSITION:
Uverda [sic] Grant — wife — 11-30-62
Edward Earl Grant [Sr.] — husband — 2-7-56
Edward Earl Grant [Jr.] — son — 8-29-83
"PHYSICAL DESCRIPTION OF HOME:
"Mr. and Mrs. Grant and Edward Earl reside in a subdivision within the lower middle class range. The house is located on a large corner lot. The front porch area was cluttered. The house consists of three bedrooms, a kitchen, pantry room, dining room, living room and bath. One of the bedrooms has been converted into a den area. The house is furnished adequately with sturdy contemporary furniture. The house was attractively decorated with [bric-a-brac,] pictures, table cloth, etc. According to Mrs. Grant, the den area would be converted into a bedroom for Krystal. A bedroom suite would have to be purchased for Krystal as the family does not have an extra one.
"BACKGROUND INFORMATION:
"Mrs. Grant was born and reared in Montgomery. Her mother is Ms. Betty Sanders and her father is deceased, Aubry Eugene Ogle. Ms. Betty Sanders is presently an open Protective Service case. Mrs. Grant is the fifth child of six children. . . . Mrs. Grant was placed in a foster home for a year in Montgomery. Mrs. Grant and her mother did not have a cooperative relationship during her childhood. According to the Department of Pensions and Security records, Mrs. Grant drank excessively and ran around with the wrong crowd during her younger years. This type of behavior changed when she met Mr. Grant. Mrs. Grant obtained her GED in 1979. She completed the tenth grade at Robert E. Lee High School. She received nurses aid training at Estes and Engleside Nursing Homes. She was employed as a shift manager at Krystal's [Krystal restaurant] for three years.
"Mr. Grant is originally from Selma, Alabama in Dallas County. His parents are *Page 245 
N.I. and Vera Grant. Mr. Grant graduated from Dallas County High School in 1976. He attended George C. Wallace Junior College for two years, entering in 1976. His occupation varies in the areas of an electrician and maintenance person.
"Mr. and Mrs. Grant met in 1981 while she was employed at Krystal's. They dated for one year and married on February 7, 1982.
"Mr. and Mrs. Grant filed a petition for temporary legal custody of her half-sister, Christine Sanders, in 1982. Their petition was withdrawn due to the child's parents' reconciliation.
"Mr. and Mrs. Grant have never had a child neglect/abuse complaint filed against them. In July, 1985, Mrs. Grant came to the DPS office requesting assistance with her electric bill from Alabama Power Company. The total amount of the bill was $204.05 with a disconnect notice. Mrs. Grant had $100 toward the amount of the bill. Their financial situation was a result of her being laid off from work on 5-31-85 until 7-10-85. Mr. Grant was employed with Dixie Electric, but his salary had decreased as he was unable to work overtime. Mrs. Grant did receive $40 per week unemployment compensation. Mrs. Grant was referred to Catholic Social Services and Community Action for assistance and was instructed to contact us if any remainder needed paying. This agency did not have contact with this family again until 3-6-86.
"EMPLOYMENT AND FINANCIAL STATUS:
"Mrs. Grant is presently unemployed. Mr. Grant continues to be employed with Dixie Electric. He works forty hours per week at $5.25 per hour. The household expenses consist of the following:
"House payment — $354
Electric Bill — $60 (estimated)
Gas — $59 (winter) — $25 summer
Water and garbage — $40 (every two months)
Television payment — $60
Truck — $180
Car — $160
House insurance — $212 ($73 every 2 months) [sic]
Car Insurance — $135 (every 3 months)
Jackson and Armstrong, M.D.'s — $10 (total $50)
Dr. Harris — $10 (total $95)
Jackson Hospital — $30 (total $700 on 6 accounts)
Universal Acceptance Books — $25 (total $600)
St. Margaret's Hospital — $25 (total $957) turned over to collection agency.
Dr. White — $10 to $40 (total $150)
Dr. Felicia — $5 to $10 (total $150)
Dr. McGuire — Send whatever can afford (total $98)
"The family does not receive food stamps. According to Mrs. Grant, they spend $50 per month on groceries. She stated she uses coupons, seeks sales and they eat a lot of dried beans and cornbread. During the interview, Mrs. Grant smoked, yet they only spend a minimal amount on groceries.
"COMMUNITY INVOLVEMENT:
"Mr. and Mrs. Grant attend church occasionally. They attend the Assembly of God and a Baptist church. Mrs. Grant was raised in the Assembly of God Church and Mr. Grant the Baptist church. They have no particular church to attend.
"HEALTH INFORMATION:
"Mr. Grant stated he is in good health. Earl, Jr. is thin, but appears to be in good health. He has tubes in his ears. Mrs. Grant has had to have several types of surgery from gallbladder, hemmorhaging and female problems. She stated she is basically in good health.
"INTERVIEW WITH MR. AND MRS. GRANT:
"Mr. and Mrs. Grant stated the only problems they have are financial. Mrs. Grant said they fuss like all married couples. She said they had never contemplated divorce, but no one knows what the future holds. According to Mr. and Mrs. Grant, they have never been arrested or used drugs. According to Mrs. Grant once *Page 246 
a year when they celebrate their anniversary they may have an alcoholic drink. She was very quick to point out Earl would be spending the night with someone. She said she grew up in a drinking situation and refuses to live in it now.
"Mrs. Grant said before Krystal moved to Madison County, she stayed in their home a lot. According to Mrs. Grant, Krystal never gave her any problems. She said she purchased Krystal's baby bed and feels Krystal is hers.
"Mrs. Grant stated Krystal should be with her family [and] that she knew first hand how foster homes operate. Mrs. Grant feels a child does not need to be moved often and threatened if you don't behave you'll leave. Mrs. Grant was asked if she knew for a fact this is happening with Krystal or was this her opinion. Mrs. Grant said when she was in foster care she gave 'information to a social worker and it was "spread" all around.' The worker clarified with Mrs. Grant that her opinion of social workers and foster parents is very low. She replied there are some who are good and some who are bad. The subject of a trial placement supervised by the Department of Pensions and Security was approached. Mrs. Grant said she would accept supervision. She also stated that Krystal deserved to have nice clothes and that is the reason they wanted to be foster parents to enable financial assistance. The question was broached of only receiving an ADC check of $59 and a Medicaid card could they financially provide for Krystal. Mr. Grant did not hesitate when responding they could.
"Mrs. Grant stated Krystal's mother is in a transition home in Selma. The last time they saw Krystal was two years ago in 1984-85. Mrs. Grant does not see any problems between Mrs. Ogle and Krystal if the child resides in their home. Mrs. Grant said if Mrs. Ogle left the house with Krystal, she would accompany her. We discussed the possibility of disruptions caused by Mrs. Ogle. Mrs. Grant stated she would 'make' Ms. Ogle leave the house if she could not calm down. Mr. and Mrs. Grant stated they would be willing to transport Krystal for mental health counselling if the Department felt this was necessary.
"According to Mrs. Grant, her sister has always wanted them to have Krystal placed in their home. Mrs. Grant said they have been unable to offer their home in the past due to their financial situation. Mrs. Grant feels they are finally making progress.
"Mrs. Grant has interviewed at the State Employment Service as a Mental Health Worker I with the Glenn Ireland Developmental Center in Birmingham, Alabama. She is to receive a notice the end of March or first of April as to the status of her being hired. This employment's beginning salary is $408 biweekly. Mr. Grant has contacted several apartment complexes for employment as a maintenance manager. They plan to reside in an apartment complex if they succeed with these new employment prospects. They plan to rent the house in Montgomery. Mr. and Mrs. Grant were asked what their plans would be if the employment in Birmingham did not materialize. They stated they would remain in Montgomery. Mrs. Grant said she would retake the Mental Health Counsellor I exam and try to get employment in the Montgomery area. She said they really did not have the money to make the trip to Birmingham, but felt she had no alternative.
"Presently, Mrs. Grant helps provide care for two elderly ladies in Montgomery. They provide enough funds to purchase day care for Earl sometimes. Mrs. Grant said she enjoys helping people and this is why the Mental Health Counsellor position appealed to her.
"FAMILY COMPOSITION:
"This is a family composed of two parents and one child. It is very obvious that Mrs. Grant is the dominant role model in the nuclear family. The family's finances [expenses] exceed the salary obtained from one parent being employed. This family continues to struggle for a more sound and stable financial base by seeking employment in a higher salary range. Due to Mrs. Grant's involvement with the Department of Pensions and Security over several *Page 247 
years, she does not have a good opinion of the system. She vocalizes cooperation, yet her feelings of projection have a negative connotation. This family is struggling for stability with their natural child. To bring another child into this unstable environment could prove to be more uprooting and possibly stress [sic], causing the return of the child to foster care which could have a detrimental effect on her.
"The Resource Unit supervisor of Montgomery County Department of Pensions and Security was contacted regarding Mrs. Grant's interest in being licensed as a related foster home. After discussing their financial situation and possibility of stress due to these problems plus the past involvement of extended family members, this county feels it would not be in the best interest of a child to be placed in their home."
The trial court also concluded that Krystal's placement with the Grants would not be in her best interest. We disagree.
Mrs. Grant's statement in the report that her marriage was good, but "no one knows what the future holds," is hardly indicative of an unstable marriage. There is also no evidence to support the report's inference that Ms. Grant would not be cooperative with the Department of Pensions and Security in the future.
At the dispositional hearing, both Mr. and Mrs. Grant acknowledged the financial problems that they have faced. Mrs. Grant suffered some health problems which resulted in significant medical bills. However, the Grants' testimony at the hearing indicated that they were dedicated to meeting those obligations, and were making significant progress. Mr. Grant is steadily and gainfully employed as an electrician. At the time of the hearing, Mr. Grant was paid at a rate of $6.00 per hour, based on a 40-hour work week. He testified that he also brings in an additional $300.00 or $400.00 per month for maintenance work performed at various apartment complexes. At the time of the hearing, Mrs. Grant was actively looking for a job and appeared to have some good prospects. Moreover, the Grants were informed by a social worker at the Department of Pensions and Security that they would be eligible for financial assistance if they are approved as a foster home for Krystal.
From the evidence presented, we fail to see the same "family struggling for existence" that the social worker and the trial court found to be an unsuitable relative foster home for Krystal Ogle. Both Mr. and Mrs. Grant testified of their strong desire to care for Krystal and to provide her with a loving home. Clearly, Krystal's placement with the Grants is a suitable alternative and a less drastic measure than the termination of parental rights. Accordingly, we hold that the state failed to meet its burden of proving by clear and convincing evidence that there existed no viable alternative to the termination of Gail Ogle's parental rights. Hickman v.State of Alabama Department of Pensions Security,489 So.2d 601 (Ala.Civ.App. 1986).
Accordingly, the judgment of the Court of Civil Appeals is reversed and the case is remanded.
REVERSED AND REMANDED.
MADDOX, JONES, ALMON, ADAMS, HOUSTON and STEAGALL, JJ., concur.