REL: January 13, 2023

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2022-2023

_____

## 2210452, 2210453, 2210454, and 2210455
_____

## J.G.

## v.

## Lauderdale County Department of Human Resources

### Appeals from Lauderdale Juvenile Court
### (JU-17-189.04, JU-17-190.05, JU-17-191.06, and JU-17-192.04)

PER CURIAM.

In appeal number 2210452, J.G. ("the father") appeals from a judgment entered by the Lauderdale Juvenile Court ("the juvenile court") in case number JU-17-189.04, terminating his parental rights to J.E.G.,

who was born on March 14, 2006. In appeal number 2210453, the father appeals from a judgment entered by the juvenile court in case number JU-17-190.05, terminating his parental rights to E.D.G., who was born on April 22, 2008. In appeal number 2210454, the father appeals from a judgment entered by the juvenile court in case number JU-17-191.06, terminating his parental rights to Y.L.W., who was born on August 28, 2013. In appeal number 2210455, the father appeals from a judgment entered by the juvenile court in case number JU-17-192.04, terminating his parental rights to S.R.G., who was born on August 25, 2015. This court consolidated the father's appeals, <u>ex mero motu</u>. We reverse the juvenile court's judgments.

Procedural History

On June 21, 2021, the Lauderdale County Department of Human Resources ("DHR") filed petitions to terminate the parental rights of the father and of M.G. ("the mother") to J.E.G., E.D.G., Y.L.W., and S.R.G. ("the children"). Following a trial, at which the father was not present, the juvenile court entered separate judgments on February 18, 2022, which, apart from each child's name, are otherwise identical and state, in pertinent part:

2

"1. [DHR] failed to meet its burden of proof required to prove [that the children] remain[] dependent; therefore, the court finds the [children are] not dependent and legal care, custody, and control of [the children] is hereby awarded to [the mother].

"2. [DHR's] petition[s] to terminate the parental rights of the mother ... [are] hereby DENIED.

"3. [DHR] is ORDERED to implement a transition plan for [the children] to return home to [the mother] by Friday, February 18, 2022.

"4. It is in the best interest of [the children] to terminate the parental rights of the father[]; therefore, [DHR's] petition[s] to terminate the parental rights of the father ... [are] hereby GRANTED.

"5. The parental rights of the father ... be and the same are hereby permanently severed and terminated as to [the children].

"6. The parties may submit legal briefs within seven (7) days from the date of this order regarding the severance of the father's parental rights in light of the preservation of the mother's parental rights."

On February 28, 2022, the father filed a postjudgment motion in all four cases, challenging the termination of his parental rights; on that same date, the juvenile court entered separate orders in each case denying the father's motion. The father filed a timely notice of appeal in each case on March 2, 2022.

2210452, 2210453, 2210454, and 2210455

In <u>Roe v. Conn</u>, 417 F. Supp. 769, 779-80 (M.D. Ala. 1976), the United States District Court for the Middle District of Alabama determined that, under the Due Process Clause of the United States Constitution, U.S. Const., Amend. XIV, § 1, the state can permanently revoke a parent's fundamental liberty interest only "when the child is subjected to real physical or emotional harm and less drastic measures would be unavailing." <u>Id.</u> at 779. Our supreme court eventually acknowledged that concept of constitutional law by holding that a juvenile court may terminate parental rights only if it finds "'that there exists no viable alternative to the termination of the parent's custodial rights.'" <u>See</u> <u>Ex parte Ogle</u>, 516 So. 2d 243, 243 (Ala. 1987) (quoting <u>Hickman v. Alabama Dep't of Pensions & Sec.</u>, 489 So. 2d 601, 602 (Ala. Civ. App. 1986)). In <u>Ex parte Beasley</u>, 564 So. 2d 950 (Ala. 1990), the Alabama Supreme Court reformulated the language of the test to provide that a juvenile court "must inquire as to whether 'all viable alternatives to termination have been considered,'" 564 So. 2d at 952, but we find no indication that the supreme court meant that a juvenile court satisfies the Due Process Clause when it only "considers" a viable alternative. As

4

the law currently stands, if a court may achieve the compelling governmental objective at stake through a means other than the drastic action of permanently revoking the custodial rights of the parent, a juvenile court cannot terminate parental rights. See J.B. v. DeKalb Cnty. Dep't of Hum. Res., 12 So. 3d 100, 115 (Ala. Civ. App. 2008) (plurality opinion) (authored by Moore, J., with Pittman, J., concurring, Thompson, P.J., concurring in the result, and Bryan and Thomas, JJ., dissenting).

In the judgments in these cases, the juvenile court denied the petitions to terminate the parental rights of the mother and ordered that the custody of the children be returned to her. At the same time, the juvenile court granted the petitions to terminate the parental rights of the father, who was divorced from the mother and who had only visitation rights with the children. In his appeals to this court, the father requests that this court pronounce a bright-line rule to clarify that, based on the viable-alternative prong of Ex parte Beasley, a juvenile court cannot terminate the parental rights of a noncustodial parent when the custodial parent can safely resume custody of the children. We decline to address that point, however, because it is not necessary to the disposition of these appeals, which concern solely the issue whether the juvenile court erred

5

in terminating the parental rights of this particular noncustodial parent. The resolution of that issue depends on whether placement of the children with the mother achieves the state's compelling interest at stake in the underlying proceedings.

The evidence in the record indicates that the father had been found indicated for physically abusing S.W., the mother's oldest child and the father's stepchild, in 2005. See Ala. Admin. Code (Dep't of Hum. Res.), r. 660-5-34-.07(1). The father was found indicated for neglect and abuse of S.W., J.E.G., and E.D.G. in May 2012 as a result of domestic violence between him and the mother. In 2017, after another incident of domestic violence between the mother and the father, this time occurring in the presence of Y.L.W. and S.R.G., all five children were removed from the family home. On April 17, 2017, the mother obtained from the Lauderdale Circuit Court a protection-from-abuse ("PFA") order restraining the father from contacting her or the children. That PFA order was amended in March 2018 to allow the father contact with the children, but not the mother. Eventually, the father pleaded guilty to assaulting the mother, and, in accordance with his plea agreement, the Lauderdale Circuit Court entered a permanent PFA order precluding any

6

contact between the father and the mother and restraining the father from harming the children or interfering with their custody.

DHR initially offered the father parenting classes, domestic-violence classes, anger-management classes, and counseling and referred the father for a psychological evaluation, a substance-abuse assessment, and drug screens. After the PFA order was amended in March 2018, DHR also allowed the father to exercise supervised visitation with the children. A DHR social worker testified that the father did not follow through with the services offered to him by DHR and that, although he had expressed to her in 2020 that he needed inpatient substance-abuse treatment, to her knowledge, he had not enrolled in such treatment. The DHR social worker indicated that the father's conduct during his visitations with the children had led to multiple changes in visitation supervisors. According to the DHR witnesses, the father had visited the children only sporadically, sometimes missing visits due to a myriad of health problems; the testimony indicated that the father had last visited J.E.G. and S.W. on January 14, 2020, and had last visited E.D.G., Y.L.W., and S.R.G. in August 2020. The visitation supervisor for the January 2020 visits testified that, for the most part, the father had interacted

appropriately with J.E.G. and S.W., but, she said, J.E.G. and S.W. had constantly complained during the visits.

A therapist who was referred by DHR to provide services to the children in 2017 testified that, in February 2020, she had recommended that J.E.G. no longer visit the father because it had been reported to her that the father had continued to fail drug screens and because S.W. and J.E.G. had reported that the father had convinced J.E.G. to steal things and deliver them to the father. The father's visitations with the children had ceased following that recommendation. However, the mother and the father were subsequently found indicated for "neglect, other risk of serious harm," when the mother, who had regained custody of E.D.G., Y.L.W., and S.R.G., had taken those children to a party at which the father was present. The mother and the father were later divorced by a judgment entered by the Lauderdale Circuit Court on March 9, 2021. In December 2021, the father contacted DHR about restarting his visitations with the children; according to a DHR witness, a social worker had directed him to contact his counsel and the father had not contacted DHR again.

At the conclusion of the trial, the juvenile court indicated that it would be terminating the father's parental rights because it considered him to be "an ongoing risk to the children." Presumably, the juvenile court determined that the father had not overcome his substance-abuse problems, his penchant for domestic violence and physical abuse, and his criminal behavior and, thus, that he continued to present a threat of real harm to the children. See Montgomery Cnty. Dep't of Hum. Res. v. T.S., 218 So. 3d 1252, 1262 (Ala. Civ. App. 2016) (holding that, in reviewing a judgment in a termination-of-parental-rights case, this court presumes that the juvenile court implicitly made those findings of fact necessary to sustain its judgment). Although the father maintains that the record does not contain sufficient evidence to sustain such findings, the evidence cited above could have led the juvenile-court judge to be clearly convinced otherwise, and our standard of review does not permit this court to reweigh the evidence to reach a different conclusion. See Ex parte Bodie, [Ms. 1210248, Oct. 14, 2022] ___ So. 3d ___ (Ala. 2022). Thus, the record substantiates that the state had a compelling interest in protecting the children from the harmful conduct of the father.

Having determined that the father presented a risk of harm to the children, the juvenile court was, at that point, required to utilize the least drastic legal remedy available to protect the children from that harm. In its judgments, however, the juvenile court did not expressly address whether the children could be protected from the risk of harm presented by the father by any means other than termination of his parental rights. The judgments do not contain any language indicating that the juvenile court considered and rejected other alternatives. In the orders denying the father's postjudgment motion, the juvenile court also did not address that point. Instead, the juvenile court simply determined that it would be in the best interests of the children to terminate the parental rights of the father. However, the constitutional framework acknowledged by our supreme court requires a juvenile court to terminate a parent's parental rights for the best interests of the children only after it has exhausted all other viable alternatives.

In his postjudgment motion, the father asserted that the children's being returned to the mother's custody was a viable alternative to the termination of his parental rights. The juvenile court could have properly rejected that alternative only if it was clearly convinced from the evidence

that placement of the children with the mother would not adequately protect the children from the risk of harm posed by the father. Thus, we examine the evidence in the record to determine whether the juvenile court received evidence sufficient to support that determination. See K.R.S. v. DeKalb Cnty. Dep't of Hum. Res., 236 So. 3d 910 (Ala. Civ. App. 2017).

The evidence showed that, through counseling and therapy, the mother had learned to recognize signs of abuse. The mother testified that she would not allow the father to abuse her again or to compromise her relationship with the children. As stated above, the mother obtained a PFA order that prevented the father from having any contact with the mother and the children, which she had violated on only one occasion before the juvenile court determined that she had sufficiently rehabilitated herself to resume custody of the children. That PFA order was subsequently amended to permanently enjoin the father from having any contact with the mother and from engaging in any harmful conduct toward the mother or the children and to require law-enforcement officials to intervene to assure compliance with the terms of the PFA order. The mother divorced the father in 2021, and the divorce judgment

11

does not give the father any specified visitation rights with the children.

A family counselor testified that the mother had adequately addressed her past issues with abuse and that the mother had allayed the concerns of the children regarding whether they would ever again witness domestic violence between the mother and the father.

In J.C.D. v. Lauderdale County Department of Human Resources, 180 So. 3d 900, 901 (Ala. Civ. App. 2015), this court considered an appeal from a judgment terminating the parental rights of J.C.D. to his children. The judgment also directed DHR to return the children to the custody of their mother, S.B. This court stated, in pertinent part:

> "This court has consistently held that termination of the parental rights of a noncustodial parent is not appropriate in cases in which the children can safely reside with the custodial parent and the continuation of the noncustodial parent's relationship does not present any harm to the children. See S.M.W. v. J.M.C., 679 So. 2d 256 (Ala. Civ. App. 1996); Talley v. Oliver, 628 So. 2d 690 (Ala. Civ. App. 1993); In re Beasley, 564 So. 2d 959 (Ala. Civ. App. 1990); and Miller v. Knight, 562 So. 2d 274 (Ala. Civ. App. 1990). See also A.J.H.T. v. K.O.H., 983 So. 2d 394, 406-07 (Ala. Civ. App. 2007) (Moore, J., concurring in part and dissenting in part)."

180 So. 3d at 901.

This court in J.C.D. proceeded to conclude that the juvenile court's determination that the children in that case could be returned to the care

12

of S.B. amounted to an implicit finding that S.B. could adequately provide for the safety, permanency, and other needs of the children. 180 So. 3d at 901-02. Although there was testimony reflecting a history of abuse between S.B. and J.C.D., this court observed that DHR had presented no evidence indicating that J.C.D. had compromised the children's safety in the four years preceding the conclusion of the trial or that the continuance of J.C.D.'s status as a noncustodial parent with supervised visitation would expose the children to the threat of physical or emotional harm from J.C.D. Id. at 902. This court further noted that the record contained no evidence indicating how the children would benefit from the termination of J.C.D.'s parental rights. Id. Accordingly, in J.C.D. we concluded that the juvenile court should have determined that the children's being returned to the custody of S.B. constituted a viable alternative to the termination of J.C.D.'s parental rights, and we reversed the judgment terminating his parental rights. Id.

In the present cases, unlike in J.C.D., the juvenile court at least implicitly determined that the mother could not adequately protect the children from harm when it denied the father's postjudgment motion; however, the foregoing evidence shows not only that the mother had

13

rehabilitated herself to the point that she could regain custody of the children, but also that she had sufficiently adjusted her circumstances to prevent further abuse by the father. At the time of trial, the mother had successfully completed therapy and counseling, had divorced the father, had obtained a permanent PFA order for the benefit of herself and the children, and had displayed proper protective capacity over the children. The record indicates that the father has had no visitation with the children since 2020 and that he has no specified court-ordered visitation rights. Thus, the evidence shows, without dispute, that the children are protected from having any adverse contact with the father. Contrary to the assertion made by the dissent, the court in this opinion is not "speculating" as to the present circumstances showing that the mother has and can adequately protect the children from any risk of harm presented by the father. ___ So. 3d at ___ (Thompson, P.J., dissenting).

Also, like in J.C.D., there is no evidence in the record indicating how termination of the father's parental rights would otherwise benefit the children. In most cases, the termination of parental rights serves to free up children for adoption so that the children can achieve permanency and stability. See Ex parte Bodie, ___ So. 3d at ___ (Parker, C.J.,

14

concurring in part and concurring in the result). However, when a juvenile court awards permanent custody of children to their natural parent, their interest in permanency and stability has been satisfied and a termination of the parental rights of the noncustodial parent will not advance that interest in any respect. Because the mother is properly fulfilling the parental role of providing the children with permanency and stability, the termination of the father's parental rights is not necessary for that purpose.

In reaching our decision, we distinguish this case from S.N.W. v. M.D.F.H., 127 So. 3d 1225 (Ala. Civ. App. 2013), cited in the dissent. ___ So. 3d at ___ (Thompson, P.J., dissenting). In S.N.W., this court affirmed a judgment terminating the parental rights of S.N.W. so that D.W. could be adopted by his stepfather, V.W.H. In reaching our decision, we examined the evidence showing that D.W., who was a teenager at the time, had not had a relationship with S.N.W. since her infancy and did not know S.N.W. because he had been incarcerated for stabbing D.W.'s mother during a visitation exchange and that V.W.H. had fulfilled the paternal role throughout D.W.'s life. In rejecting S.N.W.'s argument that the juvenile court in that case should have maintained the status quo as

15

a viable alternative to termination of his parental rights, this court stated, in part, that

> "preserving the status quo will prevent the child from accessing the benefits available to her if she is allowed to be adopted by the stepfather and, consequently, would not be in her best interest. Thus, the juvenile court correctly concluded that maintaining the status quo is not a viable alternative to termination of the father's parental rights."

127 So. 3d at 1230. In this case, no one has come forward to adopt the children, and the juvenile court was not asked to balance the benefits to the children of adoption, which can be achieved only by termination of parental rights, see Ala. Code 1975, § 26-10A-29(b), against the alternative of maintaining the status quo. In S.N.W., unlike in this case, D.W. would have been deprived of a beneficial and permanent father-child relationship with V.W.H. if we had reversed the judgment. Maintaining the "status quo" in this case, in which the mother will resume sole legal and physical custody of the children, does not in any away impair the stability and permanency interests of the children.

This case is also easily distinguishable from A.E.T. v. Limestone County Department of Human Resources, 49 So. 3d 1212 (Ala. Civ. App. 2010), another case cited by the dissent. ___ So. 3d at ___ (Thompson, P.J., dissenting). In A.E.T., this court determined that, when the parents

16

of a child cannot be rehabilitated and family reunification is not foreseeable in the reasonably near future, the mere existence of a relative who could potentially serve as a placement resource does not preclude a juvenile court from terminating parental rights. 49 So. 3d at 1219. In this case, the father is not seeking reversal of the judgments on the basis that a third-party relative could possibly assume custody of the children. The father is arguing that, because the mother has, in fact, been awarded sole legal and physical custody of the children, under the circumstances set out above, the termination of his parental rights is not the least drastic remedy available to the juvenile court. None of the analysis in A.E.T. applies in this context.

We do not condone the father's behavior that led to the separation of the family or his failure to adequately redress his issues, but the termination of parental rights is reserved for those rare cases in which no less drastic measure can achieve the state's compelling objective of safeguarding children from harm or the children's interest in achieving permanency and stability. In these cases, the record shows that the state's goal of protecting the children from harm has been achieved by returning the children to the custody of the mother and restricting the

17

father's association with the mother and the children through other legal remedies. The children have been provided permanency and stability through the efforts of both the mother and the state in sponsoring her rehabilitation. Under Ex parte Ogle and Ex parte Beasley, the availability of a less drastic viable alternative precludes the termination of the father's parental rights.

## Conclusion

For the foregoing reasons, we conclude that the juvenile court erred in terminating the father's parental rights to the children. See J.C.D., supra. We therefore do not address the father's other argument for reversal of the judgments. We reverse the juvenile court's judgments terminating the father's parental rights to the children, and we remand the cases for the entry of judgments consistent with this opinion.

2210452 -- REVERSED AND REMANDED WITH INSTRUCTIONS.

2210453 -- REVERSED AND REMANDED WITH INSTRUCTIONS.

2210454 -- REVERSED AND REMANDED WITH INSTRUCTIONS.

18

2210452, 2210453, 2210454, and 2210455

2210455 -- REVERSED AND REMANDED WITH INSTRUCTIONS.

Hanson and Fridy, JJ., concur.

Moore, J., concurs specially, with opinion.

Thompson, P.J., dissents, with opinion, which Edwards, J., joins.

2210452, 2210453, 2210454, and 2210455

MOORE, Judge, concurring specially.

I concur in the main opinion. I write specially to address the additional argument made by J.G. ("the father") as to why the judgments terminating his parental rights to the children should be reversed.

As set out in the main opinion, the Lauderdale Juvenile Court ("the juvenile court") determined in the final judgments that the children were not dependent. Based on that finding, the father argues that, under Ex parte Beasley, 564 So. 2d 950 (Ala. 1990), as a matter of law, the juvenile court could not terminate his parental rights. In a letter to this court explaining that it would not be filing a brief in opposition to the father's appeals, the Lauderdale County Department of Human Resources ("DHR") noted the juvenile court's finding that the children were not dependent and basically asserted that the judgments were due to be reversed on that basis. However, a finding that a child is not dependent does not preclude a juvenile court from terminating parental rights.

Ex parte Beasley involved one parent seeking to terminate the parental rights of the other parent, and the supreme court had granted certiorari review to address whether the 1984 Child Protection Act, Ala. Code 1975, former § 26-18-1 et seq., required a court to make a "finding

20

of dependency" before parental rights can be terminated." 564 So. 2d at 950. Nevertheless, the supreme court opined that, before a court can terminate parental rights based on the petition of the state, the court first must "make a 'finding of dependency'" and second, "after it has determined that the child is 'dependent,' ... must inquire as to whether 'all viable alternatives to termination have been considered.'" 564 So. 2d at 952 (citations omitted). In a special writing in which I concurre4d in the result in J.C. v. State Department of Human Resources, 986 So. 2d 1172, 1201-06 (Ala. Civ. App. 2007), I explained that the statement in Ex parte Beasley regarding a finding of dependency when the state petitions to terminate parental rights amounted to dictum, "[a] judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential (although it may be considered persuasive)," Black's Law Dictionary 569 (11th ed. 2019) (defining "obiter dictum"), and that the statement should not be followed in future cases. Since this court issued its opinion in J.C., these are the first cases in which a party before this court has argued that a finding of dependency is, in fact, required in order to terminate parental rights, as espoused in Ex parte Beasley.

Before 1984, the only operative statute authorizing the termination of parental rights provided, in part, that "[i]f a child is found to be dependent, the [juvenile] court may" "award permanent custody to the Department of Human Resources ... with termination of parental rights ...." Ala. Code 1975, former § 12-15-71(a)(6). Naturally, based on the plain language of that statute, this court construed that statute as requiring a finding of dependency before a juvenile court could terminate parental rights. However, effective January 1, 2009, the legislature adopted the current Alabama Juvenile Justice Act ("the AJJA"), Ala. Code 1975, § 12-15-101 et seq., so that, now, a juvenile court has jurisdiction to terminate parental rights pursuant to Ala. Code 1975, § 12-15-114(c)(2). Section 12-15-319(a), Ala. Code 1975, provides, in pertinent:

> "If the juvenile court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents renders them unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents."

By its plain language, § 12-15-319 does not require a juvenile court to find a child dependent as a prerequisite to exercising its jurisdiction to

terminate parental rights. Furthermore, no language in § 12-15-319 or any other part of the AJJA expresses that, if the juvenile court determines that a child is not dependent, the juvenile court may not terminate parental rights. Cf. Ala. Code 1975, § 12-15-310(b) (requiring dismissal of a dependency action if the juvenile court determines that the evidence fails to show that the child is dependent).

Section 12-15-319 allows a juvenile court to terminate parental rights when the juvenile court determines that the petitioner has proven: (1) a ground for termination, (2) that no viable alternative to termination of parental rights exists, and (3) that termination of parental rights is in the best interest of the child. See Ex parte Bodie, [Ms. 1210248, Oct. 14, 2022] ___ So. 3d ___, ___ (Ala. 2022) (Parker, C.J., concurring in part and concurring in the result). In proving that a ground for termination exists, the petitioner may incidentally also prove that the child or children at issue are dependent, but § 12-15-319 does not require that the juvenile court make a separate finding of dependency as a matter of substantive or procedural law. Ex parte Beasley, 564 So. 2d at 958 (Maddox, J., concurring in the result).

In Ex parte Beasley, Justice Maddox pointed out that the statement in the majority opinion requiring a finding of dependency in state-initiated termination-of-parental-rights cases was dictum because the case did not involve a petition filed by the state and expressed hope that "the rule of law will be corrected before it becomes entrenched." 564 So. 2d at 958. I agree with Justice Maddox. The issue in Ex parte Beasley was whether a parent needed to prove the dependency of a child in order to obtain a judgment terminating the other parent's rights to the child. Because the case involved two competing parents, the supreme court had no need to address the separate question of whether the state was required to prove dependency in a termination-of-parental-rights case. None of the statements of the law concerning state-initiated petitions to terminate parental rights were relevant, much less essential, to the holding in Ex parte Beasley that a dependency finding is not necessary in a parent-initiated termination-of-parental-rights case. As Justice Maddox indicated in his special writing, the requirement of a finding of dependency originated in opinions of this court, see, e.g., Clemons v. Alabama Dep't of Pensions & Sec., 474 So. 2d 1153 (Ala. Civ. App. 1985), that were "clearly wrong and should be overruled." 564 So. 2d at 955.

Those opinions, like Ex parte Beasley, construed the 1984 Child Protection Act, which made no reference to dependency. This court, however, never explained why a finding of dependency was required under a statute that did not even mention that term. Rather, this court simply regurgitated the law from cases construing the older statute that did require a child to be found dependent before a juvenile court could terminate parental rights. See Ala. Code 1975, former § 12-15-71(a)(6). Although in Ex parte Beasley the supreme court discussed why a finding of dependency might be necessary in a state-initiated termination-of-parental-rights case, see 564 So. 2d at 954, that dictum does not express any authoritative opinion that constitutional concerns for due process or standing require a finding of dependency. The AJJA already addresses those concerns by conferring upon the state the right to file petitions to terminate parental rights, see Ala. Code 1975, § 12-15-317, and by requiring clear and convincing evidence of the statutory grounds for termination. See § 12-15-319; see also Santosky v. Kramer, 455 U.S. 745 (1982).

Since Ex parte Beasley was decided, our supreme court itself has clarified that, "[f]or a finding of dependency, the court must consider

whether there are grounds for terminating the parental rights." Ex parte T.V., 971 So. 2d 1, 4 (Ala. 2007). I take that statement to mean that, when a juvenile court makes a finding of grounds for termination, it satisfies the first prong of the two-part test set forth in Ex parte Beasley, without having to make any further or separate finding of dependency. When read in this manner and in light of the actual text of § 12-15-319, Ex parte T.V. more aptly expresses the first requirement for terminating parental rights, and our caselaw should reflect that by clearly rejecting the notion that a separate finding of dependency must be made before a juvenile court can terminate parental rights.

2210452, 2210453, 2210454, and 2210455

THOMPSON, Presiding Judge, dissenting.

I dissent. Although the main opinion purports to decline to create a "bright-line rule" that awarding custody to one parent necessarily constitutes a viable alternative to the termination of the other parent's parental rights, the result of the main opinion, in essence, creates that rule. The main opinion concludes that, "[p]resumably, the juvenile court determined that the father had not overcome his substance-abuse problems, his penchant for domestic violence and physical abuse, and his criminal behavior and, thus, that he continued to present a threat of real harm to the children." ___ So. 3d at ___. At the conclusion of the evidence, the juvenile court found the father to be "an ongoing risk" to the children. The main opinion acknowledges that "the record substantiates that the state had a compelling interest in protecting the children from the harmful conduct of the father." ___ So. 3d at ___. It then concludes that because the children could be left in the custody of the mother, that arrangement constituted an alternative to the termination of the father's parental rights. I believe that that conclusion usurps the juvenile court's discretion. It also fails to balance the father's constitutional rights with

27

the children's rights to safety and security and not to be under the threat of the father's conduct, i.e., their best interests.

The father, who was not present at the trial, has a history of abusing his stepchild and has been found indicated for neglect and abuse of the parties' children on multiple occasions. He also has an extensive domestic-violence history involving the mother and a substance-abuse history that has not been addressed during the lengthy involvement of the Lauderdale County Department of Human Resources ("DHR") with the family. Additionally, the father has made little effort to be reunited with his children. He has attended only two individualized-service-plan meetings in over four years, he has not financially supported his children, and he has only sporadically visited the children while they have been in foster care. A family counselor described the children as being "very fragile and vulnerable." As opposed to the mother, who made great strides in improving her situation, the father has failed to comply with nearly all of DHR's requests and recommendations. As the main opinion recognizes, the mother, who is now divorced from the father, obtained a "lifetime" protection-from-abuse order that permanently enjoins the

28

father from directing any harmful conduct toward the mother or the children.

Appellate courts must apply a presumption of correctness in favor of a juvenile court's findings in a termination-of-parental-rights action. J.C. v. State Dep't of Human Res., 986 So. 2d 1172, 1183 (Ala. Civ. App. 2007). This court does not reweigh the evidence. A.A. v. Jefferson Cnty. Dep't of Hum. Res., 278 So. 3d 1247, 1251 (Ala. Civ. App. 2018). "[W]e will reverse a juvenile court's judgment terminating parental rights only if the record shows that the judgment is not supported by clear and convincing evidence." J.C. v. State Dep't of Hum. Res., 986 So. 2d at 1183. "[M]aintaining the status quo is a viable option to terminating parental rights when the parent and the child enjoy a relationship with some beneficial aspects that should be preserved such that it would be in the child's best interests to continue that relationship." S.N.W. v. M.D.F.H., 127 So. 3d 1225, 1230 (Ala. Civ. App. 2013). We have held, however, that when the evidence demonstrates that a parent is incapable of being rehabilitated or that the parent's conduct or condition is unlikely to change in the foreseeable future, "'obviously no alternative can be considered viable to the end of returning the child to a normal custodial

relationship with his or her parent.'" A.E.T. v. Limestone Cnty. Dep't Human Res., 49 So. 3d 1212, 1218 (Ala. Civ. App. 2010) (quoting D.M.P. v. State Dep't of Hum. Res., 871 So. 2d 77, 92 (Ala. Civ. App. 2003) (plurality opinion)).

The main opinion speculates that the mother can adequately protect herself and the children from the father's harmful conduct. The juvenile court determined that the father was an ongoing risk to the children. The evidence supports that finding by the juvenile court, and I disagree with the implication in the main opinion that the father will not seek to challenge or modify the current orders prohibiting him from visiting the children. I agree with Chief Justice Parker's statement in his special writing in Ex Parte Bodie, [Ms. 1210248, Oct. 14, 2022] ___ So. 3d ___, ___ (Ala. 2022) (Parker, C.J., concurring in part and concurring in the result), that, "ordinarily, the viability of alternatives to termination should be analyzed based on the circumstances that are before the juvenile court at the time of the termination judgment, not based on potential future circumstances." At the time of the termination decision, the juvenile court viewed the father as an "ongoing risk" to the children. The evidence before the juvenile court was sufficient to clearly

convince that court that grounds for the termination of the father's parental rights existed and that the father's conduct or condition was unlikely to change in the foreseeable future. The evidence also supported the juvenile court's implicit finding that no viable alternatives were present at the time of the termination. I cannot agree with the main opinion that the children's best interests are served by reversing the judgments terminating the parental rights of the father.

Based on the foregoing, I would affirm.

Edwards, J., concurs.