Rel: March 24, 2023

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2022-2023

_____

## CL-2022-0799 and CL-2022-0800

_____

### R.H.

### v.

### Madison County Department of Human Resources

_____

## CL-2022-0813 and CL-2022-0814

_____

### A.H.

### v.

### Madison County Department of Human Resources

_____

### Appeals from Madison Juvenile Court
### (JU-21-131.02 and JU-21-132.02)

CL-2022-0799, CL-2022-0800, CL-2022-0813, and CL-2022-0814

FRIDY, Judge.

In these consolidated appeals R.H. ("the father") and A.H. ("the mother") appeal from judgments of the Madison Juvenile Court ("the juvenile court") terminating their parental rights to N.H. and A.G.H., their two children. We reverse and remand.

## Background

When the juvenile court tried these actions on May 31, 2022, the father was twenty-eight years old; the mother was twenty-nine years old; N.H., the older child, was four years old; and A.G.H. was a few months shy of two. The older child is autistic.

The Madison County Department of Human Resources ("DHR") first became involved with the mother and the father's family on February 10, 2021, after it received a report that the residence where the family was living was filthy and unhealthy and that the children did not have proper hygiene. DHR investigated and found that the residence was extremely dirty and cluttered and that the children appeared to be neglected. The father told DHR that he had to work twelve hours a day, that he was too tired to clean the house when he came home from work, and that he had delegated the household chores to the mother. The

mother did not work but appeared to the DHR caseworker to have mental-health issues that prevented her from cleaning the residence and properly caring for the children.

Initially, DHR placed the children with the children's maternal uncle pursuant to a safety plan; however, DHR terminated that safety plan after the maternal uncle tested positive for marijuana. DHR then placed the children in foster care on February 17, 2021. Thereafter, the Huntsville Housing Authority ("the housing authority"), the parents' landlord, evicted them from the residence where they had been living because of the condition of the residence. The housing authority also imposed a charge for damage to the residence, which the parents still owe.

DHR began providing the parents with services and commenced dependency actions regarding the children. DHR provided the parents with psychological evaluations and hired Donnie Thompson, a woman who is an independent service provider, to provide the parents with parenting instruction and assistance in finding housing and in finding employment for the mother. Thompson met with the parents three to four times per month. Thompson testified that the parents were slow to take

any action to obtain stable housing. The mother obtained employment with a company that provides other companies with temporary workers. According to Thompson, the parents did not make much progress in learning parenting skills. Thompson was still working with the parents when the juvenile court tried these actions.

Thompson testified that the parents had found a house that they wanted to rent. A relative of the owner of the house told the parents that they could move in, and they did. However, the owner of the house never executed a written lease granting them the legal right to live in the house, even though the parents paid rent. The parents moved out of the house after approximately six months. Thompson testified that the furniture she had observed in that house when she met with the parents had belonged to a previous occupant of the house and that the parents had no belongings in the house other than their clothes.

Thompson testified that the parents have a bond with the children, that the parents' interactions with the children appeared to be loving, and that she had never witnessed the parents do anything that was detrimental to the children. She said that she had received a report that the mother had said that the father had not gone to one of the parents'

scheduled visitations with the children because, he had said, he did not know what he might do to the children. The father testified that what he had said to the mother on that occasion was not intended to indicate that he might physically or intentionally hurt the children. He testified that he was indicating that he had had a very stressful day at work, that he was in a bad mood as a result, and that he did not want the children to think that they were the cause of his bad mood. He said that his work had been stressful that day because, he said, three different customers had yelled at him. The father testified that he had never committed a violent act and that no government agency had ever investigated an allegation that he had committed a violent act.

The father testified that, on the day of the trial, he and the mother were living in an extended-stay motel; however, he testified that, when he got paid the next day, he would pay the $50 application fee for an application to rent an apartment at an apartment complex. He said that he and the mother had already submitted the application but that the apartment complex would not consider the application until they had paid the $50 application fee.

The father testified that he is employed as an assistant manager at an automobile-rental company. He said that he works twelve hours per day on four days of each week, that he works thirteen hours on one day each week, and that he works eight hours on one day of each week. He earns $15 per hour for the first forty hours that he works each week and earns $22.50 per hour for all hours that he works after the first forty. He testified that his boss is the only person who can cover for him if he misses work.

The father testified that, after the housing authority evicted him and the mother from the residence that they were renting in 2021, he and the mother had not been able to obtain housing through the housing authority.

The father testified that, because of his work schedule, the only time he could visit the children was on Sunday nights after he got off work at 5:00 p.m. The father testified that he loves his children very much, that he has a bond with them, and that they always smile when they see him coming.

The father testified that the mother had damaged their only automobile when she hit a concrete culvert; that they had not then had

enough money to pay for repairs to the automobile; that, consequently, he had had to rent transportation from the automobile-rental company where he works; that the only vehicle he could rent was a cargo van that was not suitable for transporting the children; and that he still owed $1,500 for the rental of the cargo van. The parents were eventually able to pay for the repairs to their automobile.

The father testified that the older child, who is autistic, has a habit of hitting people and things. The father testified that, when the older child does that, the father talks to him and tells him that he should not hit people and things. If the child persists, the father puts him in time out for three to five minutes. The father testified that the younger child's behavior is not normal but that she has not been formally diagnosed with a disorder.

The mother testified that, when she was a teenager, she had been diagnosed with ADHD and depression and had been prescribed medication. She said that the medications had helped her but that, when she was nineteen, she thought she knew better than the doctors and stopped taking the medications. She testified that she had not taken any medication for her mental-health problems from the time she stopped

taking them at age nineteen until DHR became involved in February 2021. She testified that, after DHR became involved, she had seen a psychiatrist, who prescribed medication that had greatly improved her mood and her ability to function. She said that the psychiatrist had changed her medication several times and that, when these actions were tried, she was taking trazadone and bupropion. She testified that, before she started taking the medications that the psychiatrist had prescribed, she had had difficulty waking up in the morning and staying awake; however, the medication had alleviated those problems. She said that her interactions with the children had also improved since she began taking medication. She testified that she and the father have good relationships with the children and that she wanted to keep working on herself so that she could regain custody of them. She admitted that she and the father still had not obtained stable housing.

C.P., the children's foster parent, testified that she had known the mother before DHR became involved with the mother and father's family; her daughter was married to the mother's brother for a period, although they are now divorced. C.P. was not licensed as a foster parent when DHR

8

first became involved; she obtained a license to act as a foster parent for the specific purpose of serving as the children's foster parent.

C.P. testified that spending time with the mother and the father makes the children happy; that, in her opinion, the children need the mother and the father to remain involved in their lives; that the mother and father's continued involvement in the children's lives would benefit the children; and that, regardless of whether the juvenile court terminated the mother's and the father's parental rights, she would allow the mother and the father to remain involved in the children's lives.

After the trial, the juvenile court, on June 17, 2022, entered essentially identical judgments terminating the mother's and the father's parental rights to both of the children. The judgments contained extensive findings of fact. Regarding the issue whether there were viable alternatives to terminating the mother's and the father's parental rights, the judgments stated:

> "[DHR] has made reasonable efforts to identify and locate suitable relatives in order to determine whether such relatives might provide care for the child[ren], thus avoiding the necessity of terminating parental rights. Neither [DHR], the Court, the guardian ad litem, nor the parents have been able to identify any relative who might assume custody of either child. Relatives who were considered were either

9

> unwilling or unable to assume custody and provide permanency for them.
>
> "....
>
> "Neither [DHR] nor this Court believes that there is any alternative less drastic than termination of parental rights available to serve the best interests of the [children]. Placement alternatives which were considered were determined not to be in [the children's] best interests. Despite a diligent search, [DHR] has been unable to locate a suitable relative to assume custody of the [children]."

Neither parent filed a postjudgment motion. The mother timely appealed on June 24, 2022, and the father timely appealed on June 30, 2022.

Standard of Review

Appellate courts must apply a presumption of correctness in favor of the juvenile court's findings based on ore tenus evidence presented in a termination-of-parental-rights action and will reverse a juvenile court's judgment terminating parental rights only if the record shows that the judgment is not supported by clear and convincing evidence. J.C. v. State Dep't of Hum. Res., 986 So. 2d 1172, 1183 (Ala. Civ. App. 2007). "This court does not reweigh the evidence but, rather, determines whether the findings of fact made by the juvenile court are supported by evidence that the juvenile court could have found to be clear and convincing." K.S.B. v. M.C.B., 219 So. 3d 650, 653 (Ala. Civ. App. 2016). Clear and convincing

evidence is evidence that, "when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion." § 6-11-20(b)(4), Ala. Code 1975. "Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt." Id.

### Analysis

Under well-settled law, a juvenile court may terminate a parent's parental rights if the party seeking the termination (1) proves, by clear and convincing evidence, that one of the grounds for termination specified in § 12-15-319(a), Ala. Code 1975, exists and (2) proves, by clear and convincing evidence, that no viable alternative to terminating the parent's parental rights exists. See, e.g., J.C.L. v. J.B.L., [Ms. 2200841, Aug. 5, 2022] ___ So. 3d ___ , ___ (Ala. Civ. App. 2022). Section 12-15-319(a) provides that grounds for terminating parental rights exist if clear and convincing evidence supports a finding that the parents "are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents renders them unable to properly

11

care for the child and that the conduct or condition is unlikely to change in the foreseeable future." Section 12-15-319(a) also specifies factors for a juvenile court to consider in determining whether grounds for termination exist.

The second part of the test for determining whether parental rights can be terminated is whether there is clear and convincing evidence indicating that no viable alternative to termination exists. If there is another viable alternative that will protect the child and is less drastic than termination, termination would violate the parent's due-process rights. See Ex parte T.V., 971 So. 2d 1, 9 (Ala. 2007) ("The need to consider all viable alternatives is rooted, in part, in the recognition that the termination of parental rights is a drastic step that once taken cannot be withdrawn and that implicates due process.").

On appeal, the mother and the father make several arguments challenging the judgments terminating their parental rights; however, we find that the dispositive issue is whether DHR proved by clear and convincing evidence that there was no viable alternative to termination of their parental rights. Based on this court's holdings in A.B. v. Montgomery County Department of Human Resources, [Ms. 2210106,

Aug. 19, 2022] ___ So. 3d ___, ___ (Ala. Civ. App. 2022), and <u>P.M. v. Lee County Department of Human Resources</u>, 335 So. 3d 1163, 1172 (Ala. Civ. App. 2021), we conclude that DHR did not prove by clear and convincing evidence that there was no viable alternative to termination of the mother's and the father's parental rights. "As we explained in <u>P.M. [v. Lee County Department of Human Resources</u>, 335 So. 3d 1163, 1172 (Ala. Civ. App. 2021)], when foster parents are amenable to continued contact between the child and the parent and when the evidence suggests that such contact is beneficial for the child, maintenance of the status quo or permanent placement with the foster parents can be a viable alternative to the termination of a parent's parental rights." <u>A.B.</u>, ___ So. 3d at ___.

In the present case, C.P., the children's current foster parent, who had had a relationship with the mother that preexisted DHR's involvement, testified that spending time with the mother and the father made the children happy; that, in her opinion, it was important that the mother and the father remain a part of the children's lives; that, in her opinion, the children needed the mother and the father; and that, regardless of whether the juvenile court terminated the mother's and the

father's parental rights, she would allow the mother and the father to remain active and engaged in the children's lives. Thompson, the independent service provider, also testified that the parents have a bond with the children and that their interactions with the children appear to be loving. The mother testified that she and the father have good relationships with the children and that she wanted to keep working on herself so that she could regain custody of them. In addition, the father testified that he loves his children very much and that he has a bond with them. Thus, like in A.B. and P.M., the foster parent in the present case was amenable to continued contact between the children and the parents, and the evidence indicated that such contact benefited the children. Consequently, like in A.B. and P.M., maintaining the status quo or permanent placement with the foster mother was a viable alternative to terminating the mother's and the father's parental rights.

DHR argues that the mother has not argued in her appellate brief that maintaining the status quo was a viable alternative to terminating her parental rights; however, on page 24 of her appellate brief, the mother argues:

"Even if there is a finding of dependency, a trial court 'also must find by clear and convincing evidence that there are

14

no viable alternatives to the termination of parental rights.' Ex parte T.V., 971 So. 2d 1, 7 (Ala. 2007). A viable alternative to termination of a person's parental rights is for a child to remain in the safe and stable home of a foster parent who is willing to allow the continued contact between a parent and child. A.B. v. Montgomery County Department of Human Resources, [Ms. 2210106, Aug. 19, 2022] ___ So. 3d ___ (Ala. Civ. App. 2022). Based on the testimony of the foster parent, that viable alternative exists in this matter."

Accordingly, we find no merit in DHR's argument that the mother has not argued in her appellate brief that maintaining the status quo was a viable alternative to terminating her parental rights.

DHR also argues that the parents failed to preserve their argument that maintaining the status quo constituted a viable alternative to terminating their parental rights because, DHR says, the parents did not present that argument to the juvenile court. DHR bore the burden of proving by clear and convincing evidence that there was no viable alternative to terminating the parents' parental rights. See Ex parte Ogle, 516 So. 2d 243, 247 (Ala. 1987) (holding that the party attempting to terminate a parent's parental rights has the burden to prove, by clear and convincing evidence, that there is no viable alternative). Thus, the issue whether DHR met its burden of proof is a sufficiency-of-the-evidence question. In pertinent part, Rule 52(b), Ala. R. Civ. P., provides:

15

"When findings of fact are made in actions tried by the court without a jury, the question of the sufficiency of the evidence to support the findings may thereafter be raised whether or not the party raising the question has made in the court an objection to such findings or has made a motion to amend them or a motion for judgment or a motion for a new trial."

In Ex parte Vaughn, 495 So. 2d 83, 87 (Ala. 1986), our supreme court

explained:

"Rule 52(b) [, Ala. R. Civ. P.,] provides an exemption from the requirement of invoking a ruling by the trial court on the issue of evidentiary insufficiency when written findings of fact are made. The trial court's ruling on the sufficiency of the evidence is implicit in a decree in which the trial judge is the trier of the facts. Moreover, by making written findings of fact, the trial judge has had the additional opportunity to reconsider the evidence and discover and correct any error in judgment which he or she may have made upon initial review. Thus, when written findings of fact are made, they serve the same useful purpose as does an objection to the trial court's findings, a motion to amend them, a motion for a new trial, and a motion to dismiss under [former] Rule 41(b), [Ala. R. Civ. P.[1]] -- to permit the trial judge an opportunity to carefully review the evidence and to perfect the issues for review on appeal."

---

[1]When Ex parte Vaughn was decided, Rule 41 allowed a defendant in a nonjury case to move to dismiss an action for failure of proof. See Ex parte Vaughn, 495 So. 2d at 86 n.4. Rule 41 was amended in 1995, and that matter is now covered by Rule 52(c), Ala. R. Civ. P. See Committee Comments to October 1, 1955, Amendment to Rule 41 ("This amendment deletes the provision for dismissal by the court in a nonjury case for a failure of proof. This matter is now covered by Rule 52(c).").

In the present case, the juvenile court, in its judgments, made specific findings of fact regarding whether there was a viable alternative to terminating the parents' parental rights. Consequently, the sufficiency of the evidence to support those findings was preserved for appellate review.

Because DHR failed to prove by clear and convincing evidence that there was no viable alternative to terminating the parents' parental rights, we reverse the juvenile court's judgments and remand the causes to the juvenile court for further proceedings consistent with this opinion.

CL-2022-0799 -- REVERSED AND REMANDED.

CL-2022-0800 -- REVERSED AND REMANDED.

CL-2022-0813 -- REVERSED AND REMANDED.

CL-2022-0814 -- REVERSED AND REMANDED.

Thompson, P.J., and Moore, Edwards, and Hanson, JJ., concur.