MOORE, Judge.
S.N.W. (“the father”) appeals from a judgment of the Marshall Juvenile Court (“the juvenile court”) terminating his parental rights to D.W. (“the child”).

Procedural History

V.W.H., the child’s stepfather, filed a petition in the Marshall Probate Court to adopt the child. After receiving an interlocutory order of adoption, the stepfather and M.D.F.H. (“the mother”) filed a motion to transfer the adoption proceedings to the juvenile court for the purposes of obtaining termination of the parental rights of the father to the child. The mother then filed a petition to terminate the father’s parental rights, and the father answered the petition on February 22, 2012, and did not object to the motion to transfer or otherwise contest the jurisdiction of the juvenile court. After a trial, the juvenile court entered a judgment on October 2, 2012, terminating the father’s parental rights. On October 10, 2012, the *1227 father filed a postjudgment motion. The juvenile court purported to enter an order on October 25, 2012, denying that motion; however, the motion had been denied by operation of law on October 24, 2012. See Rule 1(B), Ala. R. Juv. P. On October 29, 2012, the father filed his notice of appeal.

Facts

At the trial, the parties stipulated that the stepfather had filed a petition to adopt the child in the Marshall Probate Court and that an interlocutory order for adoption had been entered. The parties also stipulated that, on or about January 13, 2002, the father stabbed the mother in the presence of the child at a visitation exchange in Jackson County. They further stipulated that the mother had suffered severe trauma as a result of her injuries and had incurred medical expenses in excess of $79,000 as a result of that incident. The parties stipulated further that the father had been arrested on charges of attempted murder and first-degree domestic violence, but had subsequently been convicted of only first-degree domestic violence on May 15, 2002, and had been sentenced to 20 years in prison. The parties also stipulated that, at the time of the trial, the father was serving that prison sentence and was incarcerated at the Decatur Work Release Center. The parties stipulated further that the father had not had any contact with the child since the stabbing incident and had not paid any child support since the date of his sentencing in May 2002.
The mother testified that, since the stabbing incident, she had had custody of the child, who was 12 years old at the time of the trial. She testified that the child was progressing normally as a student and had made mostly A’s and B’s her entire life.
The mother testified that the child does not know the father. She testified further that she and the stepfather have been together since 2004, that she is a phlebo-tomist, and that the stepfather owns a moving business. She testified that, if the stepfather were allowed to adopt the child, the child could be covered by the stepfather’s insurance and could receive college-tuition assistance due to the stepfather’s status as a veteran. The mother testified further that, regardless of whether the stepfather were allowed to adopt the child, he would continue to provide for the child as he had done for the previous eight years. She later testified that the child has insurance through the stepfather and that they have a savings account for the child’s college tuition.
The mother testified that the father had had a parole hearing two or three years before the trial and that he had been denied parole. She testified that she had not been notified since then that he was up for parole again. She also testified that she had not received any information from the father about whether he was earning any income at the work-release center. She testified that she previously had had to take the father to court to get him to pay child support and that he or his mother had paid support for about four months before he was sentenced. She testified that the father’s child-support obligation had been suspended once he was sentenced. She testified that, at the time of the stabbing incident, the parties had been going through a divorce.
The stepfather testified that he had been with the mother for eight years and that, during that time, the child had resided with him and the mother and he had supported the child. He testified that the child is well-rounded and wants to go to college. He testified that he did not know of any contact the child had had with the father or any of the father’s family or of any attempts the father had made to contact the child. He testified that, to his *1228 knowledge, the father had not provided •anything toward the child’s support. The stepfather testified that, if he were allowed to adopt the child, the Veterans’ Administration would pay for four years of college for the child.
The father testified that the parties had divorced because the mother had been “cheating” on him. He testified that, at the time of the stabbing incident, he had temporary custody of the child and was under the influence of and addicted to cocaine. He testified that he had been using cocaine for three or four months at the time of the stabbing incident. He testified that he had attended a 12-week drug-treatment program, “SAP,” in prison 2 years before the trial. He also testified that, while he was out on bond before he was sentenced, he had gone to treatment programs at the Huntsville Mental Health Center and at New Horizon but that he had not completed the programs because he was sentenced to prison. He testified that his treatment had been focused on depression and drug use. He testified that he had not used illegal drugs since the date of the stabbing incident.
The father testified further that, while in prison, he had obtained his general equivalency diploma, had become certified as an automotive technician, and had been working full time since March 2012. He testified that he had not been disciplined while he was in prison and that he had been moved to the work-release center in January 2012. He testified that, before the stabbing incident, he had not been convicted of any felony or other violent crime. He testified further that he would again be eligible for parole in August 2013. He testified at trial that he was not taking medication for any mental-health issues but that he had attended group-counseling sessions for depression, which sessions, he said, had also dealt with anger issues.
The father testified that he had tried to contact the child by writing a letter to the mother’s mother but that he had not received a reply.

Discussion

A.
On appeal, the father first argues that the juvenile court lacked jurisdiction to terminate his parental rights. Section 12-15-114, Ala.Code 1975, provides, in pertinent part:
“(a) A juvenile court shall exercise exclusive original jurisdiction of juvenile court proceedings in which a child is alleged to have committed a delinquent act, to be dependent, or to be in need of supervision. A dependency action shall not include a custody dispute between parents. Juvenile cases before the juvenile court shall be initiated through the juvenile court intake office pursuant to this chapter.
[[Image here]]
“(c) A juvenile court shall also exercise exclusive original jurisdiction of proceedings arising out of the above juvenile court proceedings, including, but not limited to, each of the following:
[[Image here]]
“(2) Proceedings for termination of parental rights, as this term is defined in subdivision (10) of Section 12-15-301 [, Ala. Code 1975].”
The father argues that, based on the foregoing language, a juvenile court has jurisdiction over a petition to terminate parental rights only if that petition is one “arising out of’ a prior dependency proceeding. The father maintains that, because the underlying action did not begin as a dependency matter, or arise out of any dependency proceeding, the juvenile court lacked subject-matter jurisdiction to terminate his parental rights.
*1229 We agree that § 12-15-114 bestows upon juvenile courts exclusive original jurisdiction of termination-of-parental-rights proceedings arising out of dependency proceedings, but we do not agree that juvenile courts lack jurisdiction to adjudicate petitions to terminate parental rights that do not arise out of dependency proceedings.
Section 26-10A-S, Ala.Code 1975, a part of the Alabama Adoption Code, provides:
“The probate court shall have original jurisdiction over proceedings brought under the chapter. If any party whose consent is required fails to consent or is unable to consent, the proceeding will be transferred to the court having jurisdiction over juvenile matters for the limited purpose of termination of parental rights. The provisions of this chapter shall be applicable to proceedings in the court having jurisdiction over juvenile matters.”
That section specifically empowers juvenile courts to terminate parental rights in order to facilitate the adoption of a child. Section 26-10A-3 does not mandate that the termination-of-parental-rights proceeding be predicated on a dependency proceeding or a dependency finding. Consistent with § 26-10A-3, the mother and the stepfather moved the juvenile court to accept a transfer of the adoption proceeding in order to terminate the parental rights of the father,[1] thereby invoking the subject-matter jurisdiction of the juvenile court.
Because the issue is not before us, we make no comment on whether a juvenile court can exercise subject-matter jurisdiction over a petition to terminate parental rights that does not arise out of dependency or adoption proceedings. We hold only that, because the underlying petition arose out of an adoption proceeding, the juvenile court had subject-matter jurisdiction, pursuant to § 26-10A-3, to adjudicate the petition without first adjudicating the child to be dependent.
B.
Before a juvenile court can terminate parental rights it must receive clear and convincing evidence of grounds for termination, see § 12-15-319, Ala.Code 1975, and determine that no other viable alternative exists that protects the best interests and welfare of the child. See Ex parte Beasley, 564 So.2d 950 (Ala.1990). In this case, the juvenile court found numerous grounds for termination, findings the father does not contest on appeal. The juvenile court also stated in its judgment:
“[Mjaintenance of the status quo in this case, where the father has had no contact or visitation with the subject child for almost ten (10) years is viable, but is not an alternative to terminating his parental rights, in that it is practically and functionally no different than termination.”
The father contends that the juvenile court erred in finding maintenance of the status quo to be viable but, nevertheless, terminating his parental rights.
In T.D.K. v. L.A.W., 78 So.3d 1006, 1011 (Ala.Civ.App.2011), cited by the fa *1230 ther in his brief to this court, this court stated:
“[I]f some less drastic alternative to termination of parental rights can be used that will simultaneously protect the children from parental harm and preserve the beneficial aspects of the family relationship, then a juvenile court must explore whether that alternative can be successfully employed instead of terminating parental rights.”
As that excerpt illustrates, maintaining the status quo is a viable option to terminating parental rights when the parent and the child enjoy a relationship with some beneficial aspects that should be preserved such that it would be in the child’s best interests to continue that relationship.
In this case, the father, due to his drug dependency, his violent and brutal actions against the mother, and his resultant incarceration, has not had any relationship with the child since the child’s infancy. The father currently remains in a work-release program and is eligible for parole, but the juvenile court concluded that he is unlikely to be paroled and is more likely to be serving time until the child reaches the age of majority, during which time the father will continue to have no contact with the child. As the juvenile court correctly determined, maintaining the status quo will not harm the child, but it certainly will do nothing to preserve any beneficial aspect of her relationship with the father, which is nonexistent. On the other hand, preserving the status quo will prevent the child from accessing the benefits available to her if she is allowed to be adopted by the stepfather and, consequently, would not be in her best interest. Thus, the juvenile court correctly concluded that maintaining the status quo is not a viable alternative to termination of the father’s parental rights.

Conclusion

Based on the foregoing, the juvenile court’s judgment is affirmed.
AFFIRMED.
THOMPSON, P.J., and PITTMAN, THOMAS, and DONALDSON, JJ., concur.

. We note that, ordinarily, a petitioner in an adoption proceeding moves the probate court to transfer the proceeding to the juvenile court in order to obtain a termination of parental rights; however, we find nothing in the language of § 26-10A-3 that prevents a petitioner from moving the juvenile court to accept a transfer. Furthermore, because the father did not object to the manner in which the transfer occurred, we have no basis for holding the juvenile court in error for following the procedure by which it obtained jurisdiction.