Rel: June 27, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2024-2025

_____

## CL-2024-0854 and CL-2024-0855

_____

## C.S.

## v.

## J.Z.

## Appeals from Calhoun Juvenile Court
## (JU-24-876.01 and JU-24-877.01)

PER CURIAM.

C.S. ("the mother") appeals from judgments entered by the Calhoun Juvenile Court ("the juvenile court") terminating her parental rights to K.Z. and E.Z. ("the children").[1]  We affirm the juvenile court's judgments.

---

[1]K.Z. was born in February 2015, and E.Z. was born in June 2017.

Procedural History

On May 7, 2024, J.Z. ("the father") filed in the juvenile court petitions seeking to terminate the parental rights of the mother to the children. A trial on the petitions was held on October 17, 2024. On October 22, 2024, the juvenile court entered separate but nearly identical judgments terminating the parental rights of the mother to the children. The juvenile court's judgments provided, in pertinent part:

"1. The [father] presented clear and convincing evidence, competent, material and relevant in nature, that the mother of the … child[ren] is unable or unwilling to discharge her responsibilities to and for the child[ren], and that the conduct and condition of the mother renders her unable to properly care for the child[ren] and that this conduct and condition is not likely to change in the foreseeable future.

"2. The mother's extensive, dangerous and ongoing drug addiction is a danger to herself and to [the] children.

"3. The mother has failed to provide for the material needs of the … child[ren].

"4. The mother has failed to adjust her circumstances to meet the needs of the child[ren] in accordance with agreements reached, and previous Court Orders.

"5. The child[ren are] stable in [the] father's home. The child[ren]'s stepmother is stable, has a loving and meaningful relationship with the child[ren] and is a willing adoptive resource for the child[ren].

2

"6. The best interest[s] of the … child[ren] [are] served by the mother's rights being terminated.

"WHEREFORE, it is ORDERED, ADJUDGED and DECREED as follows:

"7. The Petition[s] for Termination of Parental Rights [are] due to be and [are] hereby GRANTED. The parental rights of the … mother … are terminated."[2]

(Capitalization in original.) On October 25, 2024, the mother timely filed her notices of appeal to this court.

## Jurisdiction

As an initial matter, we note that the October 22, 2024, judgments contain no final custodial disposition of the children. Although neither party has raised the issue on appeal, this court has held that "an appellate court must initially consider whether it has jurisdiction to hear and decide an appeal: '[J]urisdictional matters are of such magnitude that we take notice of them at any time and do so even ex mero motu.' Nunn v. Baker, 518 So. 2d 711, 712 (Ala. 1987)." Alabama Dep't

---

[2]Although the juvenile court's judgments did not address whether there were viable alternatives to termination of the mother's parental rights, this court has held that a juvenile court is not "required to make a specific finding with regard to whether it had considered and rejected viable alternatives to termination. … Such a finding is implicit in the juvenile court's judgment granting the petition to terminate parental rights." D.L. v. E.L., 399 So. 3d 274, 276 n.2 (Ala. Civ. App. 2024).

of Revenue v. WestPoint Home, LLC, 256 So. 3d 1197, 1199 (Ala. Civ. App. 2018).

Section 12-15-320(b), Ala. Code 1975, provides:

"If the juvenile court determines that the parents of a child are unwilling or unable to act as parents and terminates their parental rights, it may do the following:

"(1) Transfer or continue the permanent legal custody of the child to the Department of Human Resources or to any public or private licensed child-placing agency able and willing to assume the care and maintenance of the child. An order of the juvenile court which terminates parental rights and awards permanent legal custody to the Department of Human Resources or to a licensed child-placing agency shall mean that the Department of Human Resources or the licensed child-placing agency shall have authority to make permanent plans for the child, including the authority to place for adoption and consent to adoption.

"(2) Transfer or continue the permanent legal custody of the child to the petitioner who, after study by the Department of Human Resources, is found to be able to properly receive and care for the child."

Based on § 12-15-320(b), this court has held that, generally, for a judgment terminating parental rights to be a final judgment, it must contain a permanent custodial disposition. See, e.g., D.L. v. E.L., 399 So. 3d 274 (Ala. Civ. App. 2024).

4

However, by its plain language, § 12-15-320(b) applies only when a juvenile court determines that the "parents" of the child are unable or unwilling to act as "parents." When the words in a statute are clear and unambiguous, this court must apply the statute according to its plain language. See Ex parte McCormick, 932 So. 2d 124, 132 (Ala. 2005). By using the plural term, "parents," the statute obviously refers to a situation in which a juvenile court determines that both parents of a child cannot or will not properly parent the child. When a custodial parent petitions a juvenile court to terminate the parental rights of a noncustodial parent and the juvenile court determines only that the noncustodial parent is unable or unwilling to act as a parent, § 12-15-320(b) does not apply. Thus, we hold that the October 22, 2024, judgments conclusively adjudicated the only claim before the juvenile court despite the absence of a permanent award of custody to the father. Therefore, the juvenile court's judgments are final judgments that will support these appeals. See Bean v. Craig, 557 So. 2d 1249, 1253 (Ala. 1990) (defining a final judgment as "one that conclusively determines the issues before the court and ascertains and declares the rights of the parties involved").

5

Evidence

The mother, who was 30 years old at the time of trial, testified that she began smoking marijuana when she was 17 years old and developed an addiction to opiate pain medication in 2017 after having a tubal-ligation procedure. According to the mother, the Department of Human Resources ("DHR") became involved with her and the children in 2018 after her first husband reported to DHR that she was taking Suboxone while breastfeeding. She testified that she told DHR that she had been abusing her medication and was breastfeeding her youngest daughter; however, she testified that she was not taking Suboxone at that time. The mother testified that her youngest daughter tested negative for all drugs. According to the mother, DHR closed the case without indicating her for any wrongdoing.

The mother testified that she and the father divorced in January 2019. She testified that, pursuant to an agreement, the father was awarded "primary placement"[3] of the children and she was awarded unsupervised visitation with the children on the first, third, and fifth

---

[3]We interpret this provision as awarding the father sole physical custody of the children. See L.B. v. V.T.W., 387 So. 3d 1157, 1158 n.1 (Ala. Civ. App. 2023).

weekends of each month, as well as other times. The mother testified that, at the time of that agreement, she was addicted to opiates. On June 13, 2022, the Calhoun Circuit Court entered a judgment modifying the divorce judgment; the modification judgment was admitted as an exhibit in the termination-of-parental-rights trial and provided, in pertinent part:

"1. The [mother] has a long history of abusing illegal drugs and/or unprescribed controlled substances.

"2. The January 9, 2019[,] divorce agreement entered into between the [mother] and the [father] at the time of the parties' divorce specifically provided for the [mother] to submit to drug screens upon the request of the [father]. Said agreement further provided that should the [mother] test positive for illegal or non-prescribed controlled substances that the [mother]'s visitation with the … children would be suspended.

"3. On March 20, 2019[,] the [mother] tested positive for controlled substances which resulted in the suspension of her visitation with the children.

"4. The [father] agreed for the [mother] to resume supervised visitations with the children effective with the weekend of May 31, 2019.

"5. On June 28, 2019[,] this Court ordered the [mother] to enroll in and successfully complete a 90 day drug rehabilitation program and awarded the [mother] supervised visitation pending said completion and unsupervised visitation upon completion of said drug rehabilitation program.

7

"6. On August 7, 2019, the [mother] again failed a drug screen for controlled substances which resulted in the suspension of her visitation pursuant to the January 9, 2019, divorce agreement.

"7. On May 13, 2020[,] the [mother] filed a Petition to Reinstate her visitation in which she alleged that she had engaged in and completed counseling with Edith Couch in March of 2020 and had completed an intensive drug rehabilitation program with Bradford in April of 2020.

"8. This Court again awarded the [mother] supervised visitation with the … children with said supervision lifting on December 4, 2020.

"9. On or about November of 2021[,] the [mother] again relapsed on drugs with said relapse being the use of fentanyl and heroin.

"10. The [mother] detoxed at Bradford on November 30, 2021[,] for a period of 6 days with plans that she would enter into the outpatient Beacon program until she could enroll in an inpatient drug rehabilitation program.

"11. The [mother] enrolled in the Beacon program in which she was prescribed [S]uboxone but voluntarily left the Program prior to completion.

"12. The [mother] allegedly reenrolled in the Beacon program in the Spring of 2022.

"13. Notwithstanding the [mother's] knowing that she has a substantial and ongoing addiction to drugs, the [mother] has failed to completely and appropriately address her substance abuse [issues] by undergoing continuing intensive inpatient treatment that would hopefully allow her to obtain and maintain sobriety.

"14. The outpatient program that the [mother] [chose] to enter resulted in the [mother's] being prescribed [S]uboxone legally notwithstanding being treated for addiction to [S]uboxone previously.

"15. The [mother]'s substance abuse has progressed from opiates and [S]uboxone to methamphetamine to heroin to heroin mixed [with] fentanyl.

"….

"It is therefore ORDERED, ADJUDGED and DECREED as follows:

"….

"3. VISITATION: The [mother]'s Petition to Reinstate her previously ordered visitation privileges is DENIED. The [mother]'s visitation privileges are hereby MODIFIED as follows:

"A. The [mother] is awarded SUPERVISED visitation with the … children the first and third Sundays of the month from 2:00 p.m. until 4:00 p.m. as well as any other visitation that is agreed upon between the [mother] and the [father].

"B. The [mother]'s visitation shall be strictly supervised by the [mother]'s Father …, the [mother]'s Mother …, or the [mother]'s Grandmother….

"C. Supervision is defined as eyes on (within sight of) and ears on (within hearing of) at all times. The [mother]'s Mother, Father or Grandmother shall have an affirmative duty to notify the [father] within twelve (12) hours should they learn or suspect that the [mother] has

9

relapsed on drugs or within twelve (12) hours of the [mother's] exhibiting any signs indicating a possible relapse on drugs. Failure of the supervisor to timely notify the [father] of the [mother]'s relapse or the [mother's] showing signs of relapse could result in said individual being removed as a supervisor.

"D. The [mother]'s visitation with the … children shall not occur at the [mother]'s residence nor any residence in which the [mother] resides, unless the [father] agrees in writing for the [mother]'s visitations to occur at her residence or a residence or location where the [mother] is staying overnight or residing."

(Capitalization in original.)

The mother testified that she again tested positive for fentanyl on February 6, 2024, and she stated that the most recent time she used fentanyl was on July 30, 2024. The mother testified that she entered into drug treatment at a facility operated by Quest 2 Recovery in California the next day and remained in treatment for 27 days before returning to Alabama; she testified that she had been to a  facility operated by Bradford Health Services earlier that month as well. According to the mother, she did not want to complete drug rehabilitation at the beginning of July 2024 because she "wanted to keep spiraling" and "didn't decide to go to treatment … [her]self until July 30[, 2024]." The mother testified

10

that she had been injecting fentanyl into herself on the tops of her hands and in her arms. She testified that she had developed cellulitis, which had turned to gangrene on the tops of her hands; however, she testified that the area that became infected was not where she was injecting herself with fentanyl.

According to the mother, at the time she completed her intake at the Bradford facility, she was using approximately two grams of fentanyl per day, which cost $100. She further testified that she has ingested illegal drugs by snorting them and via "booty bumps."[4] The mother testified that she knew fentanyl was dangerous even if touched and that she had used fentanyl in her bathroom at her home. She testified that she is blind in her left eye because a drug dealer "stomped" on her face.

The mother, who had resided at The Zoe Behavioral and Rehabilitation House, a sober-living facility in California, since September 21, 2024, testified that she had never resided in a sober-living facility before her current stay in California and that she had continued to relapse after every time she had gotten help. According to the mother,

---

[4]The mother testified that "booty bumps" are a method of ingesting drugs involving "the behind."

she relapsed in February 2024 because she had a miscarriage. The mother further testified that she had been diagnosed with bipolar disorder in November 2021 and was under the care of a physician in California; she testified that she had been prescribed lithium, risperidone, and buspirone for bipolar disorder and had been taking those medications since July 31, 2024.

The mother testified that she had spoken to the children on the telephone the night before the termination-of-parental-rights trial, that she talks to them on the telephone almost daily, and that they ask her all the time when they are going to be able to see her again. According to the mother, she has a relationship with the children but has not seen them since April 2024. She testified that, although she has not paid court-ordered child support, she has provided the children with gifts. The mother testified that she is trying to change and that she does not think that it is in the children's best interests to be separated from her. Although the mother testified that the children had never been injured while visiting her, she testified that she took the children with her once to buy hydrocodone from a drug dealer.

The mother testified that it would not be in the children's best interests to be around her if she continued to use heroin and fentanyl. She testified that she knows she has caused the children emotional damage; however, the mother testified that she has not caused the children physical harm and that the children should not be taken away from her when they have such a strong bond. The mother testified that, "[a]s long as I'm not using, I should be allowed to see my children." The mother further testified that she does not call the children while she is "high."

The father testified that he lives with A.Z. ("the stepmother") and 3 children, including the 2 children in this case and his 14-year-old son, who is not related to the mother. According to the father, he and the stepmother have been married for almost five years. When asked how the children have been affected by the mother over the years, the father stated:

> "I've slowly watched a progression of the [children] becoming more and more distant, more nonchalant of their phone calls. A lot of sighing. More so it's interrupting whatever they're having fun doing, whether it be us going to the card shop to play cards with all of the other kids or having a family game night, stuff like that."

13

Further, when asked about the bond between the children and the mother, the father stated:

> "I would say it's become a more unhealthy bond. It's -- we tried to foster a very healthy bond at the very beginning, but as it's progressed, [the children have] started to show a lot of signs of disappointment and, kind of, crassness to the situation, almost a disregard for a lot of the stuff. And it's been very upsetting for them."

According to the father, the stepmother is willing to be an adoptive resource for the children, and he believes that the children deserve stability and permanency, which, he testified, he and the stepmother could provide. Further, the father testified that, if there is any emotional turmoil or fallout as a result of the juvenile court's terminating the mother's parental rights to the children, he would reach out to House Counseling "and ask them what they think would be the best steps to move forward … and what would be best for the [children] to move forward."

The father testified that, when the mother called the children, they made bargains to get off the telephone quickly so that they could get back to what they were doing and agreed to talk to the mother longer the next day. According to the father, when the mother lost visitation at the end

14

of the school year, "there was a lot of emotional upset for [E.Z.], and her grades started to have a little bit of an impact."

The father testified that he is concerned about the safety of the children if they were allowed to visit the mother and worries about whether they will come back to him and the stepmother "safe and sound." He testified that the children enjoy playing with makeup and would often go through the mother's purse, which causes him concern because he is fearful that the mother would keep her drugs in her purse; he testified that he would still have those concerns if the mother was producing negative drug tests because the mother has "tested negative in the past for periods of time, and then all of a sudden, it's escalated."

The father testified that the mother's visitation with the children has been suspended between five to seven times based on her drug use. (R. 119). He testified that, during the periods between visitation ceasing and resuming, he has observed changes in the children's behavior. The father stated:

> "We've noticed some behavioral changes, especially in [E.Z.] When she's at our house, she has some structure, a bit of discipline, you know, chores to do, school work to do, the structure that we provide for her. When she goes [to the mother's], she tends to throw a lot of temper tantrums and get very emotional and, kind of, out of hand."

15

Further, when the mother's visitation was suspended in April 2024, the father testified that "[K.Z.] was very flippant about it. She almost could [not] care less. And then [E.Z.] had a very -- almost visceral[] reaction in sadness to her, and she cried a good bit. But it was rather short lived once she got back to her daily life." The father testified that the children call the stepmother "mom." According to the father, the children have asked once or twice when they would see the mother again, to which the father has responded: "Hopefully when she gets better"; he testified that he has not told the children about the mother's drug use and instead explains to them that the mother is sick and getting herself better.

The stepmother testified that the children have lived with her and the father continuously since they married approximately five years ago. According to the stepmother, their home is stable, structured, peaceful, and safe. When asked to describe her relationship with the children, the stepmother stated:

> "Well, I've been a stay-at-home mom for three years now with the exception of working … with [the father]. I get [the children] ready for school every morning. I do homework with [the children] when they are home. More often than not, I do bedtime routine just because it's easier with our schedules. We're really close. We spend so much time together."

16

According to the stepmother, neither she nor the father say anything negative about the mother in the presence of the children. The stepmother testified that she would be honored to be an adoptive resource for the children.

<u>Standard of Review</u>

"A judgment terminating parental rights must be supported by clear and convincing evidence, which is '"'[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.'"' <u>C.O. v. Jefferson Cnty. Dep't of Hum. Res.</u>, 206 So. 3d 621, 627 (Ala. Civ. App. 2016) (quoting <u>L.M. v. D.D.F.</u>, 840 So. 2d 171, 179 (Ala. Civ. App. 2002), quoting in turn Ala. Code 1975, § 6-11-20(b)(4)).

> "'"[T]he evidence necessary for appellate affirmance of a judgment based on a factual finding in the context of a case in which the ultimate standard for a factual decision by the trial court is clear and convincing evidence is evidence that a fact-finder reasonably could find to clearly and convincingly … establish the fact sought to be proved."
>
> "'<u>KGS Steel, Inc. [v. McInish]</u>, 47 So. 3d [749,] 761 [(Ala. Civ. App. 2006)].
>
> "'… [F]or trial courts ruling … in civil cases to which a clear-and-convincing-evidence standard of proof applies, "the judge must view the evidence

17

presented through the prism of the substantive evidentiary burden[,]" [Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)]; thus, the appellate court must also look through a prism to determine whether there was substantial evidence before the trial court to support a factual finding, based upon the trial court's weighing of the evidence, that would "produce in the mind [of the trial court] a firm conviction as to each element of the claim and a high probability as to the correctness of the conclusion."'

"Ex parte McInish, 47 So. 3d 767, 778 (Ala. 2008). This court does not reweigh the evidence but, rather, determines whether the findings of fact made by the juvenile court are supported by evidence that the juvenile court could have found to be clear and convincing. See Ex parte T.V., 971 So. 2d 1, 9 (Ala. 2007). When those findings rest on ore tenus evidence, this court presumes their correctness. Id."

M.W. v. Marshall Cnty. Dep't of Hum. Res., 399 So. 3d 287, 290-91 (Ala. Civ. App. 2024).

## Discussion

On appeal, the mother argues (1) that the juvenile court erred by finding that grounds for termination of her parental rights existed; (2) that the juvenile court erred by terminating her parental rights despite the existence of a viable alternative; and (3) that termination of her parental rights was not in the best interests of the children. We address each argument in turn.

18

## I. Grounds for Termination

Section 12-15-319, Ala. Code 1975, provides, in pertinent part:

"(a) If the juvenile court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parent[] of [the] child[ren] [is] unable or unwilling to discharge [her] responsibilities to and for the child[ren], or that the conduct or condition of the parent[] renders [her] unable to properly care for the child[ren] and that the conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parent[]. In a hearing on a petition for termination of parental rights, the court shall consider the best interests of the child[ren]. In determining whether or not the parent[] [is] unable or unwilling to discharge [her] responsibilities to and for the child[ren] and to terminate the parental rights, the juvenile court shall consider the following factors including, but not limited to, the following:

"….

"(2) Emotional illness, mental illness, or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of a duration or nature as to render the parent unable to care for the needs of the child[ren].

"….

"(12) Lack of effort by the parent to adjust … her circumstances to meet the needs of the child[ren] in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review."

19

In these cases, the evidence indicated that the mother had an ongoing substance-abuse problem. The mother testified that she began smoking marijuana when she was 17 years old and developed an addiction to opiate pain medication in 2017. Further, the father testified that the mother's visitation with the children had been suspended between five to seven times because of her drug use. The mother testified that the most recent time she had used fentanyl was in July 2024. She testified that she had been using approximately two grams of fentanyl per day. Further, the mother testified that she had taken the children with her to purchase hydrocodone from a drug dealer.

Evidence at trial indicated that the mother was ordered by a court to complete a 90-day drug-rehabilitation program in June of 2019. She completed an intensive drug-rehabilitation program at the Bradford facility in April 2020; she again attended a program at the Bradford facility in November 2021 after relapsing and using fentanyl and heroin; she enrolled in "the Beacon program" in the spring of 2022; and she again attended a program at the Bradford facility in July 2024. Before her most recent enrollment in a sober-living facility, she had continued to relapse after every time she had gotten help. Thus, given the mother's long

20

history of drug use and continued relapse after enrollment in multiple drug-rehabilitation facilities, "the juvenile court could have reasonably concluded that clear and convincing evidence had been presented proving that it was unlikely that the mother would be able to properly care for the children in the foreseeable future," Ex Parte Bodie, 377 So. 3d 1051, 1061 (Ala. 2022), due to her use of controlled substances and that the mother had failed to adjust her circumstances to meet the needs of the children in accordance with agreements reached and previous court orders. See § 12-15-319(a)(2) and (12).

## II. Viable Alternatives

The mother also argues that the juvenile court erred by terminating her parental rights despite the existence of a viable alternative. Specifically, the mother argues that maintaining the status quo was a viable alternative to the termination of her parental rights.

> "It is well settled that a noncustodial parent continues to maintain a fundamental right to a legal relationship with his or her child. See McQuinn v. McQuinn, 866 So. 2d 570, 572 (Ala. Civ. App. 2003). A juvenile court may only interfere with that fundamental right using the most narrowly tailored means to achieve the State's compelling interests. See Roe v. Conn, 417 F. Supp. 769 (M.D. Ala. 1976). Only two interests have been identified as sufficiently compelling to justify a termination of parental rights: the protection of children from parental abuse or neglect and the advancement of the

21

children's need for a permanent custodial arrangement. See Ex parte Bodie, 377 So. 3d 1051, 1065 (Ala. 2022) (Parker, C.J., concurring in part and concurring in the result)."

R.D. v. G.A.W., [Ms. CL-2024-0344, Nov. 1, 2024] ___ So. 3d ___, ___ (Ala. Civ. App. 2024).

"Once the court determines that termination of the parent's parental rights advances a compelling governmental interest, the court then must consider whether the government seeks to advance its interest in a manner that infringes the parent's parental rights in the narrowest manner possible. See Montgomery Cnty. Dep't of Hum. Res. v. N.B., 196 So. 3d 1205, 1214 (Ala. Civ. App. 2015) ('"A state may only interfere with [parental rights] to achieve a compelling governmental objective using the most narrowly tailored means available. Roe v. Conn, 417 F. Supp. 769 (M.D. Ala. 1976)."' (quoting J.B. v. DeKalb Cnty. Dep't of Hum. Res., 12 So. 3d [100,] 115 [(Ala. Civ. App. 2008)] (plurality opinion))); § 26-1-6(b)[, Ala. Code 1975]. '[I]f a court may achieve the compelling governmental objective at stake through a means other than the drastic action of permanently revoking the custodial rights of the parent, a juvenile court cannot terminate parental rights.' J.G. v. Lauderdale Cnty. Dep't of Hum. Res., 379 So. 3d 444, 447 (Ala. Civ. App. 2023). A juvenile court applies this 'narrowly tailored' analysis by considering whether there exists any viable alternative to termination of parental rights to achieve the government's compelling interest. See Ex parte Bodie, 377 So. 3d [1051,] 1064 [(Ala. 2022)] (Parker, C.J., concurring in part and concurring in the result); S.P. v. Madison Cnty. Dep't of Hum. Res., 315 So. 3d 1126, 1131 (Ala. Civ. App. 2020); J.B. v. DeKalb Cnty. Dep't of Hum. Res., 12 So. 3d at 115 (plurality opinion)."

M.P. v. DeKalb Cnty. Dep't of Hum. Res., 394 So. 3d 1080, 1086-87 (Ala. Civ. App. 2023). "[I]f some less drastic alternative to termination of parental rights can be used that will simultaneously protect the children from parental harm and preserve the beneficial aspects of the family relationship, then a juvenile court must explore whether that alternative can be successfully employed instead of terminating parental rights." T.D.K. v. L.A.W., 78 So. 3d 1006, 1011 (Ala. Civ. App. 2011).

The mother testified that, although she has not seen the children since April 2024, she speaks to the children on the telephone almost daily and has a relationship with the children. However, the father testified that the children had been affected by the mother's actions over the years and that he had noticed the "progression of the [children] becoming more and more distant, more nonchalant of their telephone calls" with the mother. Although the mother testified that she and the children have a strong bond, she also recognized that she had caused the children emotional damage. When asked about the bond between the children and the mother, the father stated:

> "I would say it's become a more unhealthy bond. It's -- we tried to foster a very healthy bond at the very beginning, but as it's progressed, [the children have] started to show a lot of signs of disappointment and, kind of, crassness to the situation,

almost a disregard for a lot of the stuff. And it's been very upsetting for them."

Further, the father testified that, if emotional turmoil resulted from terminating telephone calls between the mother and the children, he would reach out to House Counseling to obtain advice. According to the father, the children call the stepmother "mom" and she is willing to be an adoptive resource for the children; the stepmother testified that she would be honored to be an adoptive resource for the children. Further, the father testified that he believes that the children deserve stability and permanency, which, he testified, he and the stepmother could provide.

This court has held that "maintaining the status quo is a viable option to terminating parental rights when the parent and the child enjoy a relationship with some beneficial aspects that should be preserved such that it would be in the child's best interests to continue that relationship." S.N.W. v. M.D.F.H., 127 So. 3d 1225, 1230 (Ala. Civ. App. 2013). Preserving the status quo would not be in the best interests of the children if it would prevent them "from accessing benefits available to [them] if [they are] allowed to be adopted by the step[parent]." Id. Further, when reviewing a termination-of-parental-rights judgment,

24

"an appellate court will review factual findings of the juvenile court based on ore tenus evidence with a 'presumption of correctness' because the trial court had the benefit of 'observing witnesses … as they testified, and, therefore, [the juvenile court] was able to assess their demeanor and credibility.'"

P.G. v. J.H., [Ms. CL-2023-0828, Aug. 9, 2024] ___ So. 3d ___, ___ (Ala. Civ. App. 2024) (quoting J.C. v. State Dep't of Hum. Res., 986 So. 2d 1172, 1195 (Ala. Civ. App. 2007)).

Here, although the mother testified that she and the children have a strong bond, the juvenile court, which was in the best position to determine the credibility of the witnesses, could have determined that, as the father testified, that bond had become unhealthy and upsetting to the children such that it no longer had a beneficial aspect that should be preserved. See S.N.W., 127 So. 3d at 1230. Further, the juvenile court could have determined that preserving the status quo was not a viable alternative to termination of the mother's parental rights because it would prevent the children from the benefit of having the stepmother adopt them. Moreover, as this court has stated, "[a]t some point, … the child[ren]'s need for permanency and stability must overcome the parent's good-faith but unsuccessful attempts to become a suitable parent." M.W. v. Houston Cnty. Dep't of Hum. Res., 773 So. 2d 484, 487

25

(Ala. Civ. App. 2000). Accordingly, we conclude that the juvenile court could have found that maintaining the status quo was not a viable alternative to termination of the mother's parental rights.

### III. Best Interests

The mother finally argues that termination of her parental rights was not in the best interests of the children. This court has held that

> "a parent has a prima facie right to custody of his or her child, Moore v. State Dep't of Pensions and Sec., 470 So. 2d 1269 (Ala. Civ. App. 1985), and this right can be overcome only by clear and convincing evidence that the child's best interests would be served by permanently removing the child from the parent's custody."

R.C.M. v. State Dep't of Hum. Res., 601 So. 2d 100, 101 (Ala. Civ. App. 1991). As explained above, although the mother testified that she and the children have a strong bond, she also recognized that she had caused the children emotional damage. Additionally, the father testified that the bond between the mother and the children had become unhealthy and upsetting to the children. The juvenile court found that "[t]he child[ren are] stable in [the] father's home. The child[ren]'s stepmother is stable, has a loving and meaningful relationship with the child[ren] and is a willing adoptive resource for the child[ren]." The stepmother testified that their home is stable, structured, peaceful, and safe. Further, the

stepmother testified that she and the children are "really close," that they "spend so much time together," and that she would be honored to be an adoptive resource for the children. Therefore, the juvenile court could have reasonably concluded that termination of the mother's parental rights was in the children's best interests because it enabled the stepmother to adopt them, providing stability and permanency for the children.

<u>Conclusion</u>

Based on the foregoing, the judgments of the juvenile court terminating the parental rights of the mother to the children are affirmed.

CL-2024-0854 -- AFFIRMED.

CL-2024-0855 -- AFFIRMED.

All the judges concur.